ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED
DEC 1 9 2003
U.S. COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PATRIOT LLC,<br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA<br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 03-2840C<br><br>Judge: ____________ |

## COMPLAINT FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF AND MONEY DAMAGES

Plaintiff, Patriot LLC ("Patriot"), by and through its undersigned counsel, and in accordance with the Rules of the United States Court of Federal Claims ("COFC"), hereby submits this Complaint for Declaratory Judgment, Injunctive Relief and Money Damages.

### Parties

1. Plaintiff is Patriot, a limited liability company formed under the laws of the District of Columbia between the Stout & Teague Company and Pulte Homes, Inc.

2. Stout & Teague Company is a Washington, D.C., metropolitan area developer with 20 years experience in commercial real estate development projects.

3. Pulte Homes, Inc., is a publicly traded company with over 50 years experience in the home building and adult retirement community business. Its 2002 revenues were approximately $7.5 billion.

4. Defendant is the Armed Forces Retirement Home ("Home") in the person of the Department of Defense and the United States of America.

**Jurisdiction**

5. Jurisdiction is based on 28 U.S.C. § 1941(b) as explained by the COFC in *The Catholic University of America v. U.S.*, 49 Fed. Cl. 795, 796-800 (2001).

**Background to Claim**

6. Patriot sues to enforce the statute giving the Home the right to convey title to approximately 49 acres of land located in northeast Washington, D.C., belonging to the Home ("the 49 acres").

7. As intervenor in a related suit in this court, *The Catholic University of America v. U.S.*, No. 02-1896C, and likely to be considered a nominal defendant in that action, Patriot does not have the ability to protect its rights absent filing this action.

8. The statute governing the Home's sale of the 49 acres is the National Defense Authorization Act for Fiscal Year 1997, as amended by Congress in 1999 and 2000. A copy of the statute, as amended, is attached to this Compliant as Exhibit 1.

9. The purpose of the statute is to provide the Home a way to raise money to allow the Home to care properly for veterans of the United States Armed Forces.

10. Pursuant to and subject to compliance with this statute, the Home and Patriot entered into an Agreement of Lease with Option to Purchase ("Agreement"). A copy of the Agreement is attached as Exhibit 2. By the terms of the Agreement, Patriot agreed to pay over $32,000,000 for the 49 acres over a period of years.

11. The 49 acres are located west of The Catholic University of America ("CUA"), south of the Pope John Paul II Cultural Center, and in close proximity to several major

hospitals (Washington Hospital Center, Children's Hospital, Veterans Hospital) and universities (CUA, Trinity Divinity College, and Howard University). The 40 acres are in a rapidly appreciating area of Washington, D.C.

12. The statute allows CUA to "match or exceed the highest bona fide offer otherwise received for the purchase of the property." Ex. 1 at (b)(1)(C).

13. The statute requires that the purchaser must pay the U.S. "an amount equal to the fair market value of the real property at its highest and best economic use . . . based on an independent appraisal." Ex. 1 at (b)(2).

14. The statute states: "In no event shall the sale . . . of the property be for less than the appraised value of the property in its existing condition and on the basis of its highest and best use." Ex. 1 at (b)(2).

15. The Home has the right to cancel the Agreement if CUA and the Home comply with the statute.

16. On October 16, 2003, Patriot submitted a cash offer to purchase the 49 acres, subject to zoning, for $26,000,000. A copy of that offer is attached as Exhibit 3.

17. The statute does not require that the offer be accepted by the Home, only that the offer be "bona fide." Ex. 1 at (b)(1)(C).

## Count 1

### Home's Failure to Require CUA to Match a Bona Fide Offer of $26 Million Violates the Statute and Breaches the Agreement

18. The Home has failed to require CUA to match Patriot's bona fide offer. The Home stated on November 18, 2003, that it would not require CUA to match this $26,000,000 cash offer because the Home had not accepted it.

19. Notwithstanding the fact that the offers received by the Home were depressed by CUA's right of refusal, the Home nonetheless has refused to require CUA to match even a depressed offer of $26 million in cash that exceeds a flawed determination of the present value of the Agreement's phased offer by $4 million.

20. This conduct by the U.S. violates the clear language of the statute, violates the Agreement, and should be enjoined in order to protect Patriot's contractual right to purchase the property.

**Count 2**

**Home's Failure to Test the Proposed Sale Price of $22 Million Against a Current Appraisal Violates the Statute and the Agreement**

21. The statute requires that the amount paid for the property may not be less than "an amount equal to the fair market value of the real property at its highest and best economic use . . . based on an independent appraisal." Ex. 1 at (b)(1).

22. For an "independent appraisal" to have any relevance in establishing the "fair market value" of the 49 acres it must have been conducted within six months of the sale.

23. The most recent appraisal of the land was performed on or before November 1, 1999.

24. That appraisal valued the 49 acres at $12,600,000, or approximately $257,142 per acre.

25. An appraisal conducted on the 49 acres prior to six months before a determination of the value CUA must "match or exceed" fails to comply with the statutory requirement.

26. A present value determined from an offer to purchase the 49 acres is not an appraisal under the statute.

27. Upon information and belief, Patriot alleges that an appraisal of the adjoining portion of the Home's property, just west of the 49 acres (across North Capitol Street), has been conducted by Metzbower Watts & Huting, of Hanover, MD (the "Metzbower appraisal").

28. Upon information and belief, Patriot alleges that the Metzbower appraisal values this adjoining portion of the same land at substantially higher than $500,000 per acre.

29. Applying this per acre value to the 49 acres results in an appraised value of over $24.5 million.

30. The Home's failure to obtain an independent appraisal of the 49 acres in order to determine its fair market value violates the clear language of the statute.

31. Any attempt to use a present value placed on an offer to purchase the 49 acres violates the statute.

32. The Home's intention to sell the 49 acres to CUA for less than the probable value of an independent appraisal violates the plain language of the statute, thereby violating the Agreement and improperly depriving Patriot of its contractual right to purchase the property.

## Count 3

### The Proposed Sale to CUA Violates the Statutory Requirement that the Money Accepted by the U.S. be at Least Equal to the Fair Market Value of the Property

33. The Home's proposed sale to CUA violates the statutory requirement that the purchaser pay the U.S. "an amount equal to the fair market value of the real property." Ex. 1 at (b)(2).

34. The Home has proposed to sell, and CUA has indicated its agreement to buy, the property at a price equaling approximately $22 million.

35. There is no current, independent appraisal to which to compare this price.

36. In the absence of such an appraisal, the only evidence of fair market value is what a willing purchaser would pay for the property.

37. Patriot is a willing purchaser. It has made a bona fide offer of $26 million cash for the 49 acres.

38. As CUA's proposed purchase price of $22 million is less than the fair market value of $26 million, the price the U.S. proposes to accept from CUA violates the statute, the Agreement that incorporates the statute and improperly deprives Patriot of its contractual right to purchase the property.

**Prayer For Relief**

1. That the Court determine that the United States has violated the statute otherwise allowing the Home to sell the 49 acres by:

   a. Failing to require CUA to match or exceed the bona fide offer of $26 million cash;

   b. Failing to obtain a current independent appraisal as required by the statute;

   c. Failing to require CUA to match the fair market value of $26 million established by Patriot's cash offer in this amount.

2. That the Court enjoin the United States from proceeding to sell the 49 acres in view of the statutory violations by the Home.

3. That the Court declare that the U.S., by failing to follow the plain language of the governing statute, has also breached the Agreement.

4. That the Court order payment of Patriot's lost profits in the amount of $20,000,000.

Respectfully submitted,

D. E. Wilson, Jr.
Venable LLP
575 7th Street, N.W.
Washington, D.C. 20004
202-344-4000 (voice)
202-344-8300 (fax)

Of Counsel:

Thomas J. Madden, Esquire
Carla D. Craft, Esquire

December 19, 2003

# EXHIBIT 1
## TO COMPLAINT OF PATRIOT LLC FOR DECLARATORY AND INJUNCTIVE RELIEF AND MONETARY DAMAGES

**This Document shows the National Defense Authorization Act for Fiscal Year 1997 as amended by 1999 and 2000 amendments to the original land sale statute. The 1997 language, where amended, has been removed; otherwise it remains in plain, 13 point Lucida Grande typeface (you are reading the bold version of this type face). The 1999 language is shown in** 12 point Times. **The 2000 language is shown in *12 point bold italics Times.***

---

H.R.3230

National Defense Authorization Act for Fiscal Year 1997 (Enrolled as Agreed to or Passed by Both House and Senate)

SEC. 1053. DISPOSAL OF TRACT OF REAL PROPERTY IN THE DISTRICT OF COLUMBIA.

(a) DISPOSAL AUTHORIZED- ***(1)*** Notwithstanding title II the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 481 et seq.), title VIII of such Act (40 U.S.C. 531 et seq.), section 501 of the Stewart B. McKinney Homeless Assistance Act (42 U.S.C. 11411), or any other provision of law relating to the management and disposal of real property by the United States, the Armed Forces Retirement Home Board shall ***convey, by sale or lease***, all right, title, and interest of the United States in a parcel of real property, including improvements thereon, consisting of approximately 49 acres located in Washington, District of Columbia, east of North Capitol Street, and recorded as District Parcel 121/19.

***(2) The Armed Forces Retirement Home Board shall sell or lease the property described in subsection (a) within 12 months after the date of the enactment of the National Defense Authorization Act for Fiscal Year 2000.***

(b) MANNER, TERMS AND CONDITIONS OF DISPOSAL-
***(1) The Armed Forces Retirement Home Board shall determine the manner, terms, and conditions for the sale or lease of the real property under subsection (a), except as follows:***

***(A) Any lease of the real property under subsection (a) shall include an option to purchase.***
***(B) The conveyance may not involve any form of public/private partnership, but shall be limited to fee-simple sale or long-term lease.***
***(C) Before conveying the property by sale or lease to any other person or entity, the Board shall provide the Catholic University of America with the opportunity to match or exceed the highest bona fide offer otherwise received for the purchase or lease of the property, as the case may be, and to acquire the property***

(2) As consideration for the real property conveyance under subsection (a), the purchaser selected under paragraph (1) shall pay to the United States an amount equal to the fair market value of the real property at its highest and best economic use, as determined by the Armed Forces Retirement Home Board, based on an independent appraisal. **In no event shall the sale or lease of the property be for less than the appraised value of the property in its existing condition and on the basis of its highest and best use.**

(c) DESCRIPTION OF PROPERTY- The exact acreage and legal description of the real property to be conveyed under subsection (a) shall be determined by a survey satisfactory to the Armed Forces Retirement Home Board. The cost of the survey shall be borne by the party or parties to which the property is to be conveyed.

(d) CONGRESSIONAL NOTIFICATION- (1) Before disposing of real property under subsection (a), the Armed Forces Retirement Home Board shall notify the Committee on Armed Services of the Senate and the Committee on National Security of the House of Representatives of the proposed disposal. The Board may not dispose of the real property until the later of--

(A) the date that is 60 days after the date on which the notification is received by the committees; or

(B) the date of the next day following the expiration of the first period of 30 days of continuous session of Congress that follows the date on which the notification is received by the committees.

(2) For the purposes of paragraph (1)--

(A) continuity of session is broken only by an adjournment of Congress sine die; and

(B) the days on which either House is not in session because of an adjournment of more than three days to a day certain are excluded

in the computation of any period of time in which Congress is in continuous session.

**Reminder:**

Amended language from 1997 removed. Remaining original is in this typeface.

1999 amendments in this typeface

***2000 amendments in this typeface.***

EXHIBIT 2

# AGREEMENT OF LEASE WITH OPTION TO PURCHASE

THIS AGREEMENT OF LEASE WITH OPTION TO PURCHASE (this "**Agreement**") is made and entered into effective on the last date entered beside the signatures at the end of this Agreement (the "**Effective Date**"), by and between the Armed Forces Retirement Home, an agency of the United States of America ("**AFRH**") and Patriot LLC, a District of Columbia limited liability company ("**Developer**").

## RECITALS:

A. AFRH is the owner of all of that parcel of land located in the District of Columbia containing approximately 49 acres and formerly identified as Parcel 121/19, as described on Exhibit A attached hereto, subject, however to right-of-way easements for North Capitol Street, Irving Street, and Harewood Road (the "**Property**").

B. AFRH is authorized to convey, by sale or lease, all right, title and interest of the United States of America in the Property, subject to provisions of applicable law.

C. Developer intends to seek a rezoning of the Property and to develop the Property in four phases (herein "**Phase One**", "**Phase Two**", "**Phase Three**", and "**Phase Four**" or individually a "**Phase**" and collectively the "**Phases**") as set out in the "Best and Final Offer, Armed Forces Retirement Home—Washington, RFP #834100-01-R-4000 for 49 Acre Land Lease Development, Stout and Teague Company/Pulte Homes, Inc." dated September 19, 2002 (the "**Developer's Offer**"); and that portion of Developer's Offer depicting the Phases and entitled "Phasing Plan" (the "**Phasing Plan**") is attached hereto and incorporated herein as Exhibit B. The Phasing Plan may be altered or amended with the approval of AFRH as provided herein

E. Subject to the terms and conditions contained herein, AFRH has agreed to lease with an option to purchase, and Developer has agreed to rent with an option to purchase, the Property upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the foregoing Recitals, each of which is incorporated into and made a part of this Agreement, the mutual covenants of AFRH and Developer set forth below, and for other good and valuable consideration, the receipt and sufficiency of which each of the parties hereby acknowledges, AFRH and Developer agree as follows:

1. LEASE; TERM; LEASE COMMENCEMENT DATE; RENT

A. AFRH hereby leases the Property to Developer, and Developer hereby rents the Property from AFRH for a term commencing on the "Lease Commencement Date" (as

that term is hereinafter defined) and continuing for fifty (50) years thereafter upon and subject to, the terms of this Agreement.

B. Developer shall pay base rent to AFRH annually in advance on the "Rent Commencement Date" (as that term is hereinafter defined) and on each anniversary thereof until the expiration of the lease term. Base rent for the first year of the lease term shall be Two Million Eight Hundred Ten Thousand Dollars ($2,810,000.00). Base rent shall thereafter increase by one percent (1.0%) on each anniversary date of the Rent Commencement Date until the tenth (10th) anniversary of the Rent Commencement Date. Base rent for each succeeding ten (10) year period shall be "fair market rent" for such period, as established prior to the commencement thereof by an independent, professional reappraisal of the Property as if vacant and unimproved, free and clear of the lease, at the highest and best use permitted under then current building codes, zoning laws, and regulations, and other restrictions, laws, and regulations then affecting the Property. Each reappraisal shall be performed by an appraiser selected by AFRH in its sole discretion.

C. Developer covenants and agrees to pay on and after the Lease Commencement Date, during the Term, as hereinafter provided, all of the following items relating to the Property or Developer's use, occupancy, or development thereof (collectively "Impositions"): (a) real property taxes and assessments on both land and improvements, (b) personal property taxes, (c) sales and use taxes, (d) occupancy taxes, (e) water, water meter, and sewer rents, rates, and charges, (f) excises, (g) levies, (h) license and permit fees, (i) payments in lieu of taxes, (j) vault rent payments, (k) fines, penalties, and other similar or like governmental charges applicable to the foregoing and any interest or costs with respect thereto, and (l) any and all other governmental levies, fees, rents, assessments, or taxes and charges, general and special, ordinary and extraordinary, foreseen and unforeseen, of any kind and nature whatsoever, and any interest or costs with respect thereto, that at any time prior to or during the term of the lease assessed, levied, confirmed, imposed upon, or would arise or become due and payable out of or in respect of, or would be charged with respect to, the Property, or any document to which Developer is a party creating or transferring an interest or estate of Developer in the Property, the use and occupancy thereof by Developer, or this transaction, and (2) encumbrances or liens suffered or created by Developer on (A) the Property, or (B) the sidewalks, streets, or public spaces in front, adjoining the Property, or upon the site, or (C) the Property in respect of any vault, passageway, or space in, over, or under such sidewalk or street, or (D) any other appurtenances of the Property, or (E) any personal property, equipment, or other facility used in the operation thereof. Each such Imposition, or installment thereof, during the term of the lease shall be paid not later than the later of ten (10) days prior to the due date thereof or ten (10) days prior to the date on which any fine, penalty, interest, or cost may be added thereto or imposed by law for the nonpayment thereof, whichever is earlier. Said obligation of Developer to pay all such installment payments prior to the expiration date of the lease shall survive any expiration or termination of the lease.

D. All rent payable by Developer shall be absolutely net to AFRH without any abatement, deduction, counterclaim, set-off, or offset whatsoever, so that the lease shall yield, net to AFRH when due hereunder, the base rent during the term of the lease and that all costs, expenses, and charges of every kind and nature relating to the Property shall be paid by Developer. All rent shall be paid to AFRH by electronic funds transfer.

E. The following terms, as used in this Agreement, shall have the following meanings: (i) the term **"Lease Commencement Date"** shall mean the date of Final Rezoning (as that term is hereinafter defined) and (ii) the term **"Rent Commencement Date"** shall mean the date that is sixty (60) days after the Lease Commencement Date.

F. Neither the lease nor the interest of Developer in the lease, shall be sold, assigned, or otherwise transferred, whether by operation of law or otherwise, nor shall any of the issued or outstanding capital stock of any corporation (other than a publicly traded corporation, to which the restrictions in this paragraph shall not apply) which directly or indirectly constitutes, owns, or controls Developer under this Lease or which is a general partner of any partnership that is Developer under the lease be sold, assigned, or transferred, nor shall additional stock in any such corporation be issued if such sale, assignment, or transfer or issuance of additional stock will result in a change of the controlling stock ownership of such corporation as held by the shareholders thereof on the date when such corporation became Developer under the lease pursuant to the terms hereof, nor shall any general partner's interest or other ownership interest (excepting a limited partnership interest) in a partnership, joint venture, or other entity that is Developer under the lease be sold, assigned, or transferred, nor shall Developer sublet the Property as an entirety or substantially as an entirety, without the prior written consent of AFRH, which AFRH may withhold in AFRH's sole discretion.

G. Developer shall not mortgage, pledge, or encumber the Property or Developer's interest in the lease without AFRH's prior written consent, which consent may be withheld by AFRH in AFRH's sole discretion.

H. Developer shall not do, or cause or allow to be done, anything whereby the estate, rights, and interest of AFRH in the Property or any part thereof might be impaired. Developer shall not alter the Property, or erect any improvements thereon, during the term of the lease without AFRH's prior written consent, which consent may be withheld by AFRH in AFRH's sole discretion.

I. If Developer is in default of its obligations under the lease, AFRH, at any time thereafter, may at its option give written notice to Developer stating that the lease and the term hereby demised shall expire and terminate on the date specified in such notice, which date shall not be less than ten (10) days after the giving of such notice, and if on the date specified in such notice, Developer shall have failed to cure the default, then the lease and the term hereby demised and all rights of the Developer under the lease shall expire and terminate as if that date were the date herein definitely fixed for the termination of the term of this lease, and Developer

shall quit and surrender the Property, and the Deposit shall be forfeited to AFRH as hereinafter provided in Section 9A.

J. Developer shall pay, as additional rent under the lease, the Rezoning Fee (or so much thereof as has been paid by AFRH to Developer and not reimbursed to AFRH in accordance with the provisions of Section 11 below) and all Rezoning Filing Fees (as defined in Section 11 below) incurred by AFRH and not reimbursed to AFRH. The Rezoning Fee (or so much thereof as has not been reimbursed to AFRH) and all such Rezoning Filing Fees (to the extent not reimbursed to AFRH) shall be added to the portion of the first installment of base rent due under the lease.

K. Base Rent shall be prorated daily and any overpayment will be refunded to Developer within thirty (30) days after the termination of the lease.

L. The provisions of this Section 1 shall not survive any termination of this Agreement.

2. ACCESS TO THE PROPERTY

A. AFRH, Stout and Teague Company and Pulte Home Corporation (Stout and Teague Company and Pulte Home Corporation being all the members of Developer) have executed and delivered that certain Right of Entry Agreement dated as of January 28, 2003 (the "ROE Agreement"). AFRH hereby consents to the assignment of the ROE Agreement to Developer and the term of the ROE Agreement is hereby extended until the earlier of the Lease Commencement Date, the Final Settlement or any earlier termination of this Agreement. Any default by Permittee under the ROE Agreement shall constitute a default under this Agreement.

B. Upon full execution hereof, AFRH shall provide Developer reasonable opportunity to copy any and all documents in the possession or control of AFRH that pertain to the Property, exclusive of (i) all prior correspondence or agreements with or from prospective Developers or contract Developers, (ii) documents between AFRH and its attorneys, and (iii) documents prepared by AFRH pertaining to AFRH's deliberative process as to sale of the Property. In addition, thereafter AFRH shall deliver to Developer copies of any such materials it receives after full execution hereof, within five (5) days after AFRH's receipt thereof.

3. DEPOSIT.

A. Developer has prior to the Effective Date delivered to AFRH an initial earnest money deposit in the amount of Four Hundred Thousand Dollars ($400,000.00) (the "**Initial Deposit**"). From the Effective Date of this Agreement until the date of final and absolute extinguishment ("**Final Extinguishment**") of the right of first refusal to the Property held by Catholic University of America ("CUA") (CUA's right of first refusal being herein the "**Right of First Refusal**"), the Initial Deposit shall be reduced to One Hundred Thousand Dollars

($100,000.00), and within fifteen (15) business days after the Effective Date, AFRH shall refund to Developer Three Hundred Thousand Dollars ($300,000.00) of the Initial Deposit.. Within fifteen (15) business days after the Final Extinguishment of the Right of First Refusal, Developer (i) shall restore the Initial Deposit to Four Hundred Thousand Dollars ($400,000.00) cash by delivery of Three Hundred Thousand Dollars ($300,000.00) (the "**Restoration Deposit**") to AFRH, and (ii) shall deliver to AFRH an additional earnest money deposit in the amount of Four Hundred Thousand Dollars ($400,000.00) (the "**Second Deposit**") which may, at Developer's option, be in the form of a letter of credit. If a letter of credit is used as the Second Deposit, such letter of credit will be termed herein the "**Letter of Credit**" and will be issued by a federally chartered financial institution selected by Developer and reasonably acceptable to AFRH. The Letter of Credit will be in a form reasonably acceptable to AFRH. On the Rent Commencement Date or, if Developer shall have sent the Developer's Election Notice (as hereinafter defined), at the Initial Settlement (as hereinafter defined), Developer shall deliver to AFRH an additional earnest money deposit in the amount of Two Hundred Thousand Dollars ($200,000.00) (the "**Third Deposit**"), bringing the total earnest money amount to One Million Dollars ($1,000,000.00). At the Second Settlement (as hereinafter defined) Developer shall provide evidence, in form reasonably satisfactory to AFRH, that it has expended no less than One Million Two Hundred Fifty Thousand Dollars ($1,250,000.00) in the aggregate in hard costs and "Allowed Soft Costs" (hereinafter defined) associated with development improvements (i.e., clearing and grading; installation of erosion controls; construction and/or installation of roads, sidewalks, storm drainage facilities, and utilities), which development improvements are located or to be located on Phase One or any Phase for the benefit of Phases Two through Four of the Property. As used herein, the term "**Allowed Soft Costs**" shall mean (i) all costs related to designing, engineering, permitting and bonding the clearing and grading and construction/installation listed in the preceding sentence plus (ii) up to $100,000. in rezoning expenses pertaining to Phases Two through Four, (all of the aforesaid costs, fees and expenses being herein the "**Later Phases Costs**"). In the event that Developer, as of the Second Settlement, has spent less than $1,250,000.00 in such Later Phases Costs, Developer shall post as it's "**Final Deposit**" the difference between (i) $1,250,000.00 and (ii) the sum of what Developer has expended on such Later Phases Costs, with the amount of any public improvement bond posted with the municipal authorities that also names AFRH as a beneficiary being counted as funds expended by Developer for Later Phases Costs. The Final Deposit shall be returned to Developer promptly upon Developer providing evidence to AFRH that it has satisfied its obligation with regard to spending $1,250,000 in Later Phases Costs. "**Deposit**" as used herein will mean and refer to the amount held by AFRH or otherwise posted by Developer from time-to-time in accordance with the provisions of this Agreement.

B. Failure to deliver the Restoration Deposit and the Second Deposit in a timely manner shall be a default hereunder. For purposes of this Agreement, Final Extinguishment shall occur upon a) renunciation of such Right of First Refusal by Catholic University or b) entry of a final, unappealable court order from a court of competent jurisdiction either (i) providing that the Right of First Refusal has been extinguished, or (ii) establishing a time period during which the Right of First Refusal must be exercised and failure of CUA to exercise the Right of First Refusal during such period.

C. The cash component of the Deposit will bear interest, all of which interest will for purposes of this Agreement be deemed part of the Deposit, at the following rate: From the date deposited with AFRH until the date that the Deposit is applied to the Purchase Price or otherwise disposed of in accordance with the provisions of this Agreement at an annual simple rate of interest established, beginning May 7, 2001, and on each annual anniversary date thereafter, as the rate being paid by Bank of America (or its successor entity) on such date for one year Certificates of Deposit. All such interest on the Deposit shall be reported to the Internal Revenue Service using Developer's tax identification number which is: 43-2006551.

D. The Deposit shall be applied to the Purchase Price at the Final Settlement (as hereinafter defined) or otherwise disposed of in accordance with the provisions of this Agreement. Notwithstanding the aforesaid, the Letter of Credit, if any, shall be returned to Developer at the Final Settlement or otherwise disposed of in accordance with the provisions of this Agreement.

4. OPTION TO PURCHASE; PURCHASE PRICE AND METHOD OF PAYMENT.

A. Developer shall have a one-time option to elect to acquire fee simple to the entire Property upon, and subject to, the terms of this Agreement. Such option will be exercisable by Developer at any time by Developer's delivery to AFRH of written notice (**"Developer's Election Notice"**) stating that Developer has elected to purchase, rather than lease, the Property. Once made, such election shall be final and irrevocable and the provisions of this Agreement pertaining to lease of the Property shall automatically terminate and be of no force and effect as of the date of Developer's delivery of Developer's Election Notice. Subject to adjustments as set forth in Section 4C., 4D., 4E., 4F. and 5B. below, the Purchase Price for the Property under such option (the **"Purchase Price"**) shall be Thirty-two Million Seven Hundred Six Thousand Nine Hundred and Six Dollars ($32,706,906.00).

B. The Purchase Price shall be payable by electronic funds transfer or certified funds at each Settlement in accordance with the following schedule:

| | |
|---|---|
| Initial Settlement/Phase One | $ 8,480,000.00 |
| Second Settlement/Phase Two | $ 8,345,592.00 |
| Third Settlement/Phase Three | $ 5,407,944.00 |
| Final Settlement/Phase Four | $10,473,371.00 |

At each Settlement Developer shall acquire the acreage shown and depicted on the Phasing Plan as the acreage applicable to the Phase being acquired, and no more than such acreage.

C. In the event that the entire Property is zoned only for residential use and with no commercial component, then the Purchase Price shall be reduced to Thirty-one Million Three Hundred Twenty-six Thousand Fifty-six Dollars ($31,326,056.00), with the full reduction in Purchase Price being applied only to Phase Four. In other words, in Section 4B the Purchase Price

for Phase Four shall be reduced to Nine Million Ninety-two Thousand Five Hundred Twenty-one Dollars ($9,092,521.00).

D. Developer and AFRH agree and acknowledge that the Purchase Price was established based on an anticipated market rate residential unit yield for the Property and each of its Phases (the "**Anticipated Unit Density**") as shown on Exhibit C attached hereto and incorporated herein (the "**Additional Purchase Price Schedule**"), and in the event that the actual approved market rate ("market rate" meaning not subject to any type of municipal price controls) residential unit yield for any one or more of the Phases exceeds the Anticipated Unity Density for such Phase (as such Anticipated Unit Density is shown on the Additional Purchase Price Schedule), then an additional purchase price shall be payable to AFRH as hereinafter described. If within three (3) years after the Settlement on any Phase, the number of market rate residential units permitted for construction on the Phase of the Property acquired at such Settlement (such permitting for construction being evidenced by issuance of building permits for construction of residential units) exceeds the Anticipated Unit Density for such Phase, then in such event Developer shall pay AFRH as an "**Additional Purchase Price**" the amount determined by multiplying Ten Thousand Dollars ($10,000.00) times the number of market rate residential units in excess of the Anticipated Unit Density for such Phase; provided, however, in no event will the total Additional Purchase Price for the Property be more than $3,810,000. Installments of Additional Purchase Price, if any, shall be payable in connection with each Phase, pro rata, in accordance with the "**Additional Purchase Price Schedule**" as building permits are issued, with adjustments of the Additional Purchase Price being made between the parties within sixty (60) days after on the third anniversary of each settlement. Unpaid installments of Additional Purchase Price shall bear simple interest at an annual rate of Twelve Percent (12%) from and after the date such installments are due and payable. AFRH agrees and acknowledges that Developer shall have no obligation to maximize the number of units to be constructed on the Property. The obligations of this Section 4D shall expressly survive each settlement hereunder and the deed for each Phase shall contain a covenant prohibiting the construction for three (3) years after the applicable Settlement of more market rate residential rate units on such Phase than the number allowed pursuant to the Additional Purchase Price Schedule unless, and until, the full Additional Purchase Price payable with respect to all Phases previously conveyed to Developer shall have been paid to AFRH. A breach of such covenant by Developer will not result in a forfeiture or reversion of title, but will entitle the AFRH to seek legal or equitable relief including, without limitation, an injunction prohibiting the construction or occupancy of additional market rate residential units on the Property until any required Additional Purchase Price has been paid to AFRH.

E. In the event that the Initial Settlement has not occurred on or before the date that is thirty (30) months after the later of a) the Effective Date or b) the date of Final Extinguishment of the Right of First Refusal, and neither party is in default hereunder, then beginning on the date that is thirty (30) months after the later of a) the Effective Date or b) the date of Final Extinguishment of the Right of First Refusal, (the "**Escalator Start Date**"), the Purchase Price, shall increase until the day of the Initial Settlement at the annual simple rate that is the lesser of (i) six percent (6%) or (ii) 150% of the percentage increase (if any) of the Consumer Price Index

Component for Housing (published every month by the United States Department of Labor, Bureau of Labor Statistics) from the Effective Date to the Escalator Start Date provided, however, in no event shall such increase, if determined pursuant to clause (ii) of this sentence, be at an annual rate that is less than two percent (2%). In either event, the amount of the Purchase Price increase described in this Section 3.F shall be determined for the actual number of days between the Escalator Start Date and the Initial Settlement based on a 365-day year and the increase in the Purchase Price due to the escalator shall be payable prorata across the Settlements in the same proportion as the Purchase Price is payable in accordance with the applicable provisions of Sections 4B or 4C above.

F. The Purchase Price shall be increased by the Rezoning Fee (or so much thereof as has been paid by AFRH to Developer and not reimbursed to AFRH prior to the date of the Initial Settlement) and all Rezoning Filing Fees not reimbursed by Developer prior to the date of the Initial Settlement in accordance with Section 11 below. The Rezoning Fee (or so much thereof as has not been reimbursed to AFRH) and all such Rezoning Filing Fees (not reimbursed to AFRH) shall be added to the portion of the Purchase Price to be paid at the Initial Settlement.

5. SETTLEMENT.

A. Subject to the full satisfaction of each and all of the Conditions Precedent in accordance with Section 6 hereof, settlements on the Property (collectively "**Settlements**" and individually a "**Settlement**") shall occur in four phases as follows: (i) within sixty (60) days after the Final Rezoning (as defined in Section 6 below) of the Property Developer shall acquire Phase One of the Property (the "**Initial Settlement**"); (ii) within twenty-four (24) months after the Initial Settlement Developer shall acquire Phase Two of the Property (the "**Second Settlement**"); (iii) within forty-eight (48) months after the Initial Settlement Developer shall acquire Phase Three of the Property (the "**Third Settlement**"); and within seventy-two (72) months after the Initial Settlement Developer shall acquire the balance of the Property (the "**Final Settlement**").

B. Developer may, at its sole option and upon written notice/s to AFRH made no fewer than sixty (60) days prior to an anticipated date for Settlement, extend for up to twenty-four (24) months the date/s for the Second Settlement, Third Settlement and/or Final Settlement; provided, however, that from the date required for Settlement in accordance with Section 5A through the actual date of Settlement that portion of the Purchase Price applicable to the Phase being acquired at the extended Settlement shall increase at the annual simple rate of eight percent (8%), payable on a monthly basis for each month, or portion thereof, during the extension period. Any increase in the Purchase Price pursuant to this Section 5B shall be made after the Purchase Price adjustments required pursuant to Sections 4C and 4E above.

C. Developer shall provide AFRH thirty (30) days advance written notice of the anticipated date of each Settlement.

D. Settlements shall be held at the offices of Commercial Settlements, Inc., 1413 K Street, NW, Washington, D.C. 20005 or such other location in the District of Columbia as is reasonably acceptable to both parties.

E. The deed from Seller to Developer ("Seller's Deed") will be exempt from transfer tax and fees in accordance with Sections 47-902 of the District of Columbia Code. All Settlement-related costs and expenses pertaining to examination of title, title insurance, title certificate, recording costs, transfer taxes, revenue and documentary stamps, survey preparation and Developer's attorneys fees shall be at the expense of Developer; provided, however, Developer shall have no obligation to pay the District of Columbia transfer tax on Seller's Deed. AFRH's attorney's fees shall be at the cost and expense of the AFRH.

F. Real estate taxes, if any, for the respective Phase to be acquired at a Settlement are to be adjusted to the date of such Settlement and thereafter paid by Developer.

G. At each Settlement, AFRH shall execute and deliver to Developer a Special Warranty Deed for the that portion of the Property being acquired conveying title in accordance with Paragraph 6 hereof and shall execute such affidavits as are reasonably required by the Developer's title insurance company.

H. AFRH shall deliver to Developer possession of that portion of the Property being acquired at the respective Settlement free of tenants and human occupants.

I. At any Settlement, AFRH shall provide Developer a written easement agreement permitting, but not requiring, Developer to begin development work on all portions of the Property subject to (i) AFRH's written approval of the specific development work to be undertaken by Developer, which approval may not be unreasonably withheld, conditioned or delayed, (ii) Developer's receipt of all required permits and approvals from the District of Columbia, (iii) Developer's posting of all required public improvement bonds, (iv) Developer's indemnification of AFRH for all costs and expenses arising from or out of Developer's development of the Property and (v) Developer's delivery to AFRH of evidence satisfactory to AFRH, in AFRH's sole judgment, that funds are immediately available to pay for all development work to be undertaken by Developer on the Property.

J. In the event that either the Lease Commencement Date or the Initial Settlement has not occurred on or before the date that is five (5) years after the Effective Date because there has been no Final Extinguishment of the Right of First Refusal or due to failure of satisfaction of any of the Conditions Precedent set forth in Section 6 below, and neither party is in default hereunder, then at any time after such 5-year period either party may terminate this Agreement upon 120-day prior written notice to the other party (a "**Termination Notice**"); provided, however that no such termination shall be effective unless and until (i) the Deposit is returned to Developer, and (ii) in the event that there has been no Final Extinguishment of the Right

of First Refusal, the payment by AFRH to Developer of a Break-up Fee of Two Hundred Seventy-five Thousand Dollars ($275,000) (the "**Break-up Fee**").

6. CONDITIONS PRECEDENT.

A. The obligation of the Developer to purchase the Property shall be contingent upon each and all of the following conditions being satisfied at the time of each Settlement (the "**Developer's Conditions Precedent**"):

(i). The Phase subject to the Settlement shall have been zoned and if, and only if, an application for a Planned Unit Development has filed, a corresponding development plan approved (which plan is a component of the rezoning and not a plan for engineering the development of the Property) by all applicable authorities of the District of Columbia to a zoning category of R-5-A or greater (that is to say, to R-5-A or to another category permitting residential development at a density no less than that permitted by R-5-A or to a commercial category ), with special exceptions as required to obtain row and/or multi-family dwellings, and any applicable period for appealing said rezoning or Planned Unit Development approval shall have expired without an appeal having been filed (or if an appeal is filed, entry of a final decree by a court of competent jurisdiction upholding the rezoning, and all applicable appeal periods of such decree shall have expired without an appeal having been filed) (the "**Final Rezoning**"). If at any time after submitting the Property for rezoning, Developer in its best business judgment determines that a Final Rezoning consistent with the provisions of this Agreement is not achievable, then Developer at its sole discretion, may elect, upon written notice to AFRH made no less than 120 days prior to either option (the "**Notice Period**" being the 120 days after Developer sends any such notice to AFRH), (i) to waive this Condition 6B and proceed to Settlement at the Purchase Price on a date mutually agreeable to Developer and AFRH within sixty (60) days after expiration of the Notice Period, or (ii) to terminate this Agreement and receive a return of the Deposit (which obligation to return the Deposit shall expressly survive any such termination); provided, however, that during the Notice Period, AFRH shall have the right to request Developer to continue with the rezoning at the cost and expense of AFRH, and should AFRH make such request, Developer shall, at AFRH's sole cost and expense, continue to pursue the rezoning of the Property and shall rescind its notice of intention to terminate the Agreement; however under no circumstance will Developer have any obligation to purchase the Property unless the Property is subject to a Final Rezoning to a zoning category of R-5-A or greater as defined above. In the event the Contract is terminated by Developer in accordance with the provisions of this Section and the Deposit is returned to Developer, then thereafter neither party shall have any continuing obligation to the other hereunder, other than the obligations contained in this Agreement that expressly survive termination of this Agreement.

(ii). There shall be a Final Extinguishment of the Right of First Refusal with evidence of such extinguishment being provided to Developer's title insurance company so that the title insurer in the reasonable exercise of its discretion agrees to insure title to the Property in Developer's name at standard rates without exception to the Right of First Refusal.

(iii). Each of the AFRH's representations and warranties set forth in this Agreement shall in fact be true and correct in all material respects at the time of each Settlement.

(iv) The Property will, in fact, contain no materials, substances, products or wastes of a toxic or hazardous nature in violation any applicable federal, state or local statute or ordinance, the presence of which material, substance, product or waste cannot reasonably be attributed to Developer's activities on the Property.

(v) There shall be no notices of violations of local ordinances or requirements issued by legal authority or prosecutions in any court effective against the Property (and which are not caused by Developer).

In the event that the Developer's Conditions Precedent set forth herein are not satisfied on the date otherwise required for a Settlement hereunder and neither party is in default hereunder, then Developer shall, at its sole option, either (i) waive the unsatisfied Developer's Conditions Precedent and proceed to Settlement without diminution in the Purchase Price or claim for damages; or (ii) terminate this Agreement and be entitled to the return of its Deposit with interest and, if the failed condition is the failure of Final Extinguishment of the Right of First Refusal and only in such event, payment of the Break-Up Fee; or (iii) if the unsatisfied condition is absence of Final Extinguishment of the Right of First Refusal, then in addition to the remedies provided in (i) and (ii), and subject to AFRH's right to terminate this Agreement in accordance with the provisions of Section 5J, extend the date for Settlement until the Final Extinguishment of the Right of First Refusal. In the event of termination of the Agreement, return of the Deposit, and payment of the Break-Up Fee neither party shall have any continuing obligation to the other hereunder, other than the obligations contained in this Agreement that expressly survive termination of this Agreement.

B. The obligation of AFRH to sell the Property shall be contingent on each and all of the following conditions being satisfied at the time of the applicable Settlement (**"AFRH's Conditions Precedent"**):

(i) Final Extinguishment of the Right of First Refusal shall have occurred.

(ii) With respect to the Second Settlement/Phase Two only, the Developer shall have satisfied its obligations as to development improvements or posted the Final Deposit as set forth in Section 3.A of this Agreement.

(iii) All installments of Additional Purchase Price due and payable prior to the date of the applicable Settlement, if any, shall have been paid to AFRH.

(iv) AFRH shall not have terminated this Agreement pursuant to Section 20 below.

(v) Developer shall have sent the Developer Election Notice to AFRH.

(vi) There shall be no material default by Developer in its obligations set forth in this Agreement.

In the event of termination of the Agreement, return of the Deposit, and payment of the Break-up Fee, if applicable, neither party shall have any continuing obligation to the other hereunder, other than the obligations contained in this Agreement that expressly survive termination of this Agreement.

7. TITLE.

A. Title to the Property shall be good and marketable and shall be conveyed in fee simple, free and clear of all liens and encumbrances except for those matters (the "**Permitted Encumbrances**") included on the title commitment issued by Commonwealth Land Title Insurance Company (the "**Title Commitment**"), a copy of which is attached hereto and incorporated herein as Exhibit D, and for those covenants, conditions, restrictions and easements reserved or created by AFRH in accordance with its rights under Section 11C below

B. At the time of each Settlement, Developer shall have the right to re-examine the title to the Property and to object to any defects or encumbrances affecting the Property being purchased that have been placed of record on the Property subsequent to the date of the Title Commitment (hereinafter called "**Subsequent Objections**"). If there are any Subsequent Objections, Developer shall so notify AFRH. AFRH shall then have the right, but not the obligation, to cure such Subsequent Objections and the time for settlement shall be extended for thirty (30) days to permit such cure. If AFRH fails to cure such Subsequent Objections by the time of Settlement, as it may have been extended pursuant to this Section 7B, then Developer may, in its sole discretion, (i) waive the Subsequent Objections and proceed to Settlement, (ii) terminate this Agreement and receive the Deposit, (iii) cure such defect or encumbrance at Developer's cost, not to exceed One Hundred Thousand Dollars ($100,000.00), which cost will be reimbursed as a credit to the Purchase Price at the next Settlement, (iv) if AFRH is in default, declare AFRH in default and pursue whatever remedies are available in accordance with Section 9B below, or (v) extend the date of such Settlement for a period of time not exceeding four (4) months for AFRH to continue to attempt to remedy the Subsequent Objections, without Developer waiving its options under (i) (ii), (iii) and (iv) above if AFRH is unable to cure such Subsequent Objections prior to the extended date for such Settlement.

C. Notwithstanding any provision to the contrary set forth above, AFRH shall not allow any liens or encumbrances to be filed or placed against the Property prior to a Settlement that AFRH does not intend to remove at such Settlement, and any violation of this provision by AFRH shall be a default under this Agreement.

8. WARRANTIES, REPRESENTATIONS AND COVENANTS.

A. Developer accepts the Property in its "as is-where is" condition" without representation or warranty of any type or kind except for those representations and warranties expressly contained in this Agreement. AFRH warrants and represents now and as of the date of each Settlement (as to the portion of the Property being conveyed at such Settlement where the representation or warranty pertains to the physical characteristics of the property) and covenants with Developer as follows:

(i) Subject to Final Extinguishment of the Right of First Refusal, AFRH is not bound by any other agreement to sell the Property or any portion thereof to any other person or entity.

(ii) This Agreement is, and all agreements, instruments and documents to be executed and delivered by AFRH pursuant to this Agreement shall be, duly authorized, executed and delivered by AFRH. This Agreement is, and all agreements, instruments and documents to be executed and delivered by AFRH pursuant to this Agreement shall be, after the expiration of the Congressional notification period described in Section 1053(d) of the National Defense Authorization Act of 1997 without any Congressional action affecting the transaction contemplated by this Agreement, valid and legally binding upon AFRH and enforceable in accordance with their respective terms.

(iii) Except as disclosed in the Phase I and Phase II environmental reports prepared by Law Engineering and Environmental Services, Inc., dated August 23, 2000, to AFRH's actual knowledge the Property has never been used for landfill, dumping or other waste disposal activities or operations.

(iv) To AFRH's actual knowledge, but without independent investigation, no portion of the Property is subject to any proffered conditions or other agreements with any governmental agency or other party affecting the use thereof, except those matters that are recorded among the land records of the District of Columbia, those matters disclosed in this Agreement and those matters that may be imposed on the Property during its rezoning or otherwise with the consent of Developer.

(v) To AFRH's actual knowledge, no archeological or historically significant ruins or artifacts are located on the Property except the Southeast Gate Lodge identified as building number 63 in the Qualitative Analysis of The Architectural And Landscape Significance Of The USSAH by Geier Brown Renfrow, Architects and the iron fence along portions of the site's perimeter. AFRH hereby discloses to Developer that there is the possibility that another house on the Property, located on Scale Gate Road, may have some historic significance.

(vi) AFRH has not entered into any leases, rights or claims of use, occupancy or possession or other agreements, oral or written, affecting the Property or Developer's contemplated development thereof that cannot be terminated upon thirty (30) days prior written notice;

(vii) In accordance with the laws of the District of Columbia Code, AFRH hereby advises Developer that the characteristic of the soils of the Property as described by the Soil Conservation Service of the United States Department of Agriculture in the Soil Survey of the District of Columbia published in 1976, as amended, and as shown on the Soil Maps of the District of Columbia is in part "Urban Land-Sassafras-Chillum Association" and in part "Udorthents Association". Further information about the characteristic of soils on the Property may be obtained by Developer, at Developer's cost and expense, from a private soil testing laboratory, the District of Columbia Department of Environmental Services or the Natural Resources Conservation Service of the Department of Agriculture.

(viii) In accordance with the requirements of the D.C. Underground Storage Tank Management Act of 1990, as amended by the District of Columbia Underground Storage Tank Management Act of 1990 Amendment Act of 1992 (D.C Code 8-113.01 et seq.) (the "**Act**") and the D.C. Underground Storage Tank Regulations, 20 DCMR Chapters 55-68 (the "**Regulations**"), AFRH hereby informs Developer that AFRH has no knowledge of the existence or removal from the Property during AFRH's ownership of the Property of any "underground storage tanks" as that term is defined in the Act and the Regulations. Information pertaining to underground storage tanks and underground storage tank removals of which the D.C. Government has received notification is on file with the D.C. Department of Consumer and Regulator Affairs, Environmental Regulation Administration, Underground Storage Tank Branch, 2100 martin Luther King, Jr. Avenue, S.E., Washington, D.C., telephone (202) 404-1167.

B. Developer warrants and represents now and as of the date of each Settlement as follows:

(i) Developer is a duly formed District of Columbia limited liability company authorized to transact business in the District of Columbia, and has the power, right and authority to enter into this Agreement and to perform the obligations required under this Agreement and in the instruments and documents referenced herein. The individuals executing this Agreement and the instruments referenced herein on behalf of Developer have the requisite power, right and authority to bind Developer.

(ii) The execution and delivery of this Agreement and the performance by Developer of its obligations hereunder have been duly authorized by all requisite action, and will not conflict with or result in a breach of any of the terms, conditions or provisions of the Articles of Organization or Operating Agreement of Developer, and will not conflict with or result in a breach of any law, regulation or order, or any agreement or instrument to which Developer is a party or by which Developer is bound or subject; and this Agreement and the documents to be delivered by Developer pursuant to this Agreement, will each constitute the legal, valid, and binding obligations of Developer, enforceable in accordance with their respective terms, covenants, and conditions; and there are no claims, defenses (personal or otherwise) or offsets to the validity of or enforceability against Developer, of this Agreement and the documents to be delivered pursuant hereto.

(iii) Developer is not insolvent as such term is defined under any federal or state law.

9. DEFAULT.

A. If Developer shall default under this Agreement and such default has not been cured within ten (10) days after the receipt of written notice from AFRH specifying the nature of the default, provided that in the event that Developer fails to close as required herein then the period for cure of the default shall be five (5) business days after receipt of written notice from AFRH, AFRH shall deliver to Developer an Affidavit stating the nature of the default, that it has remained uncured after written notice thereof (the "**Affidavit**"). In the event Developer does not deliver to the Escrow Agent written notice that it objects to the Affidavit within five (5) business days following Developer's receipt of the Affidavit, and the default by Developer is in its obligation to settle in accordance with the provisions of this Agreement, then AFRH shall have the right to declare the Deposit forfeited to AFRH, as sole and agreed upon liquidated damages (it being difficult or impossible to determine the amount of damages) and as AFRH's sole remedy for such failure to settle. With respect to any failure by Developer to close on its acquisition of a Phase, AFRH hereby waives all remedies at law or in equity other than forfeiture of the Deposit. With respect to Developer's breach of any other material obligation of Developer hereunder, AFRH shall have the right to pursue any and all available legal or equitable remedies including, without limitation, specific performance (subject to the limitation set forth below), and to recover from Developer its attorneys' fees and costs in connection therewith provided, however, AFRH waives all claims for consequential or punitive damages and AFRH further waives any right to sue for specific performance to enforce the provisions set forth in Section 11 of this Agreement..

B. If AFRH shall default under any of the provisions of this Agreement and such default is not cured by AFRH within ten (10) days after receipt of written notice from Developer of such default, provided that in the event that AFRH fails to close as required herein then the period for cure of the default shall be five (5) business days after receipt of written notice from Developer, Developer may, at its option, either: (i) terminate this Agreement and have AFRH reimburse Developer the Deposit, the Break-up Fee and any portion of the Rezoning Fee not previously reimbursed or paid by AFRH to Developer ,in which event the parties shall have no further rights or liabilities one to the other hereunder; or (ii) leaving the Deposit in place, seek specific performance of this Agreement. In addition to the foregoing, if Developer elects to terminate this Agreement pursuant to clause (i) of the preceding sentence and such termination occurs after Developer has reimbursed AFRH for any Rezoning Fee or Rezoning Filing Fees, AFRH shall refund to Developer the amount of such reimbursement/s. Developer in its sole discretion shall elect which remedy or remedies to pursue in the event of AFRH's default, which election shall be made within thirty (30) days after such default and written notice thereof shall be provided to AFRH.

10. CONDEMNATION/EMINENT DOMAIN.

AFRH shall promptly notify Developer if any condemnation or eminent domain proceedings shall be commenced by a competent public authority against all or any of the Property prior to the date of Settlement. If such proceedings propose the taking of any portion of the Property which would be significant to Developer's planned use, in Developer's reasonable discretion, Developer shall have the right, at its option, to either (a) terminate this Agreement and have its Deposit immediately refunded by AFRH, whereupon the parties shall be fully released from any and all rights and liabilities one to the other hereunder except those that expressly survive termination of this Agreement, or (b) if, and only if, Developer has exercised its option to acquire fee simple to the Property, to proceed hereunder with all proceeds from such condemnation to be paid to Developer.

11. REZONING AND SITE DEVELOPMENT

A. Developer, shall begin the zoning process for the Property promptly after the Effective Date, and shall thereafter diligently pursue Final Rezoning of the Property in accordance with the provisions of this Agreement and the Phasing Plan, as the Phasing Plan may be altered or amended from time to time in accordance with the provisions of Section 11B below. Developer's scheduling community planning meetings and/or other pre-application meetings shall be deemed commencement of the zoning process. Developer intends to seek approved densities for development of the Property as described in the Offer and on the Phasing Plan, and intends to seek such densities initially in a zoning of the entire Property into one or more zoning districts. With the prior written approval of AFRH, which will not be unreasonably withheld, Developer may pursue additional densities, design changes and/or change of use by making application for applicable rezoning or special exception on a phase-by-phase basis. AFRH hereby authorizes Developer to prepare and file in the name of Developer and thereafter diligently pursue approval of, all applications for zoning, rezoning, permits and entitlements as necessary to obtain a Final Rezoning that has been approved by AFRH. If such applications in the sole name of Developer are not acceptable to the applicable governmental or quasi-governmental authorities, then AFRH shall execute all such applications that have been approved by AFRH promptly in order to permit Developer to timely file such applications. AFRH hereby designates Timothy C. Cox and any subsequent Chief Operating Officer of AFRH, as the duly authorized agent of AFRH to execute such applications, and AFRH agrees to designate additional agents of AFRH to execute such applications if requested by Developer in order to assist Developer in the timely execution and filing of such applications. As used herein, "applications" shall mean all applications and all amendments and other documents and instruments related thereto including without limitation plats, plans, proffers/entitlements, affidavits and similar documents required by appropriate governmental authorities. To the extent the same are assignable by AFRH without consent by any third parties or governmental authorities, or if such consent is required, upon obtaining such consent, all existing permits, licenses, approvals, rights, assurances and/or entitlements from applicable governmental and quasi-governmental authorities and all environmental approvals, if any, pertaining to the Property shall be transferred to the Developer at each Settlement for the applicable Phase. Developer agrees to confer with a designated representative of AFRH regularly (i.e., at least once a month) with regard to the rezoning effort, and upon AFRH's advance written request, Developer shall provide AFRH reasonable advance notice of all meetings with District of Columbia zoning

staff and other third parties (except for meetings only between Developer and its third party contractors) pertaining to the rezoning and invite AFRH's representatives to attend all such meetings. Developer shall provide AFRH with contemporaneous written or oral periodic progress reports on all significant developments at approximately once every thirty (30) days on its efforts to obtain rezoning approval and Developer shall provide to AFRH copies of all materials and plans as submitted to the applicable authorities of the District of Columbia.

B. AFRH agrees to cooperate with Developer's efforts in seeking a rezoning of the Property and/or of each Phase; provided, however, that prior to Developer making any material changes to the Phasing Plan, Developer shall have received AFRH's approval, which approval may not be unreasonably withheld, conditioned or delayed, and further provided that Developer shall pay for the preparation of all rezoning materials (subject to reimbursement by AFRH as provided in Section 11D below). AFRH agrees to cooperate reasonably with Developer (at Developer's cost including the reasonable cost of AFRH's counsel) in Developer's efforts to obtain any off-site easements that may be necessary for development of the Property. AFRH shall not be required to pay for any costs in connection with preparation or use of such documents. Developer shall pay for the preparation of all such documents. Prior to Settlements, no documents shall be recorded in the land records to convey easements across or otherwise encumber the Property without AFRH's express consent, which may be withheld in AFRH's sole discretion.

C. During the rezoning of the Property, Developer shall be responsible for the final configuration of each Phase within the Property, subject to the approval of AFRH, which approval may not be unreasonably withheld, conditioned or delayed. The configuration of each Phase will be designed to accommodate Developer's land development plans and shall be generally in accordance with the Phasing Plan; provided, however, AFRH will not be left with land-locked, inaccessible or otherwise unmarketable or undevelopable parcels after Developer's purchase of any Phase. Developer agrees as a material inducement to AFRH to enter into this Agreement that (i) Developer will not during the pendency of this Agreement take any action that would de-value, in AFRH's sole, but reasonable, judgment, the portion of the Property that from time-to-time is titled to AFRH or leave AFRH with a portion of the Property that has been damaged due to acts of Developer on adjacent portions of the Property acquired by Developer, and (ii) Developer shall develop the Property to the extent possible with the intent that those portions of the Property still titled to AFRH shall be served by utilities, storm water facilities and ingress/egress rights-of-way developed for the portion of the Property titled to Developer. Developer and AFRH shall cooperate in determining any easements to be reserved by AFRH at a Settlement for access, stormwater management facilities, and/or utility lines for the benefit of the remainder of the Property and/or property owned by AFRH that is adjacent to the Property, and the agreement with regard to such easements shall be recorded as easements in gross over and across the Property being acquired by Developer; subject to relocation by Developer to locations approved by AFRH as it develops the Property.

D. So long as the rezoning of the Property is proceeding in accordance with the Phasing Plan, the general guidelines contained in Section 6A of this Agreement and the provisions of this Section 11, then during the period prior to the Final Extinguishment AFRH shall pay Developer Two Hundred and Fifty Thousand Dollars ($250,000.00) for costs and expenses (not including filing fees or other fees required by the District of Columbia) incurred with relation to pursuing a rezoning of the Property (the "**Rezoning Fee**") on the following schedule:

(i) Upon filing the zoning application and acceptance for hearing: $100,000. When Developer is prepared to make such application, Developer shall provide written notice to AFRH accompanied by a copy of the application, an invoice for the $100,000 portion of the Rezoning Fee and a check request for the application fee payable to the District of Columbia (which application fee is to be paid directly by AFRH). Upon receipt of such letter and accompanying documents, AFRH at its sole option, may either promptly provide the necessary payment and materials to Developer or pay the $100,000 Rezoning Fee to Developer promptly but suspend any further action on the rezoning pending resolution of the Right of First Refusal.

(ii) Upon a decision by the Zoning Commission and Board of Zoning Adjustment approving a zoning category for the Property: $150,000.00.

In the event that the Rezoning Fee, or any portion of it, has been paid by AFRH to Developer and thereafter the Final Extinguishment occurs, then within thirty (30) days after the Final Extinguishment, Developer shall reimburse AFRH the Rezoning Fee, or portion thereof, previously paid to Developer (the "**AFRH Reimbursed Rezoning Sum**").

If the rezoning process is terminated prior to completion for any reason, the Rezoning Fee shall be equitably adjusted and paid by AFRH in addition to the disposition of the Deposit and the Break-up Fee, if applicable. Upon such termination, Developer shall assign all Developer's rights in the work product of such rezoning to the AFRH. Any consultant's costs and expenses incurred by Developer in excess of the Rezoning Fee shall be borne exclusively by Developer; provided, however, that Developer shall have no obligation for such costs and expenses incurred by AFRH or others after termination of this Agreement.

So long as the rezoning of the Property is proceeding in accordance with the Phasing Plan, the general guidelines contained in Section 6A of this Agreement and the provisions of this Section 11, then during the period prior to the Final Extinguishment all filing fees and other fees required by the District of Columbia in connection with the zoning application and any special exceptions ("**Rezoning Filing Fees**") will be paid directly to the municipal authorities by AFRH. In the event that any Rezoning Filing Fees have been paid by AFRH and thereafter the Final Extinguishment occurs, then within thirty (30) days after the Final Extinguishment, Developer shall reimburse AFRH all such Rezoning Filing Fees previously paid by AFRH.

Upon Final Extinguishment, AFRH's obligation to pay the Rezoning Fee and the Rezoning Filing Fees shall cease, and Developer shall become solely responsible for the payment of

all costs and expenses (including filing fees or other fees required by the District of Columbia) relating to a rezoning of the Property.

12. ENTIRE AGREEMENT; AMENDMENTS.

This Agreement, together with its exhibits, contains the entire agreement between AFRH and Developer relating to the Property and supersedes all prior and contemporaneous negotiations, understandings and agreements, written or oral, between the parties. This Agreement shall not be amended or modified and no waiver of any provision hereof shall be effective unless set forth in a written instrument authorized and executed with the same formality as this Agreement.

13. TIME.

Time shall be considered to be of the essence in the performance of the requirements of this Agreement.

14. RISK OF LOSS.

All risk of loss as a result of any exercise of the power of eminent domain or by reason of fire or other casualty, other than fire or casualty caused by Developer, its agents or contractors, with respect to the Property shall remain on AFRH until delivery of the deeds to the respective portions of the Property by AFRH to Developer or his agent or representative at each settlement.

15. NOTICES.

All notices, demands, requests or other communications required or permitted to be given hereunder must be sent either (i) by hand delivery or (ii) if not intended for AFRH, by United States certified mail, postage fully prepaid, return receipt requested or (iii) by Federal Express or a similar nationally recognized overnight courier service, or (iv) by facsimile with both confirmation of successful transmission and a confirmation copy sent by another method set forth in this Section. All such notices, demands, requests or other communications shall be deemed to have been given for all purposes of this Agreement upon the date of receipt or refusal, except that facsimile notices shall be deemed delivered on the date sent (provided the sender received confirmation of successful transmission) and except that whenever under this Agreement a notice is either received on a day which is not a business day or is required to be delivered on or before a specific day which is not a business day, the day of receipt or required delivery shall automatically be extended to the next business day. The addresses for proper notice under this Agreement are as follows:

AFRH: 3700 North Capitol Street, N.W.
Washington, D.C. 20317-0002

Attn: Timothy C. Cox
Chief Operating Officer

WITH A COPY TO: ______________________
______________________
______________________

DEVELOPER: Patriot LLC
c/o Pulte Home Corporation
10600 Arrowhead Drive, Suite 225
Fairfax, Virginia 22030
Attn: Mr. Stanley F. Settle, Jr.

WITH A COPY TO: Patriot LLC
c/o Stout and Teague
1340 Old Chain Bridge Road, Suite 400
McLean, VA 22101
Attn: Mr. G. Neel Teague

16. APPLICABLE LAW.

This Agreement shall be construed in accordance with the laws of or applicable to the District of Columbia.

17. AGENTS AND COMMISSIONS.

A. AFRH and Developer each warrant to the other that neither has dealt with any agent, broker or finder with respect to the transaction contemplated hereby.

B. In the event that any claim for commission or finder's fee is brought by any person or entity as a consequence of the transaction contemplated hereby and as a result of any action or omission of either AFRH or Developer, then AFRH or Developer, as the case may be, shall hold harmless the other party against loss, cost and reasonable attorney's fees arising as a consequence of the claim for the commission or fee. This provision shall expressly survive termination of this Agreement and/or Settlement hereunder.

18. NO MERGER.

The rights, obligations, representations and warranties created by this Agreement shall survive settlement on a Phase hereunder for a period of one (1) year after Settlement on such Phase and shall not be merged into the Deed conveying the Phase to Developer.

19. MISCELLANEOUS.

A. Developer and AFRH shall execute and/or deliver such further instruments and do such further acts and things as may be required to carry out the intent and purposes of this Agreement.

B. This Agreement may be executed in two (2) or more counterparts, each of which shall constitute one and the same instrument.

C. If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws, such provisions shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Agreement; and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Agreement.

D. Unless otherwise specifically stated, all references herein to the expiration of a certain number of days refer to calendar days. Therefore, if the expiration of a certain number of calendar days occurs on a Saturday, Sunday or banking holiday, such calendar day shall be deemed to occur on the next succeeding calendar day that is not a Saturday, Sunday, or bank holiday.

E. This Agreement is binding on the parties hereto, their respective heirs, successors and permitted assigns. Notwithstanding the foregoing, no assignment may be made by either party of the rights and obligations hereunder without the prior written consent of the other party, which consent may not be unreasonably withheld, conditioned or delayed.

F. If any action or proceeding (including any appeal thereof) is brought by Developer or AFRH to enforce its respective rights under this Agreement, the unsuccessful party therein shall pay all costs incurred by the substantially prevailing party therein, including reasonable attorneys' fees and costs to be fixed by the court.

20. AFRH'S RIGHT TO TERMINATE.

AFRH shall have the right to terminate this Agreement and to notify Developer promptly of such termination, in the following limited instances: (a) CUA exercises the Right of First Refusal and acquires the Property, (b) Federal legislation is enacted that precludes the sale or lease of the Property to Developer, and/or (c) AFRH withdraws the Property from the market because a final, unappealable order of a court of competent jurisdiction establishes a price for the Property that is deemed in AFRH's sole discretion to be unacceptable [any of items (a), (b) and (c) are herein individually a "**Termination Event**"]. Should a Termination Event occur, Developer shall notify AFRH promptly, the Deposit shall be returned to Developer with accrued interest, AFRH shall pay Developer the Break-up Fee, this Agreement shall be terminated and thereafter

neither party shall have any obligations hereunder other than those obligations that expressly survive termination of this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the Effective Date.

**DEVELOPER:**

PATRIOT, LLC, a District of Columbia limited liability company

By: Pulte Home Corporation, Member

Date: 5/1/03

By: [illegible]
Its: [illegible]

By: Stout and Teague Company, Member

Date: 5/1/03

By: [illegible]
Its: Vice President

**AFRH:**

ARMED FORCES RETIREMENT HOME,
an agency of the United States of America

Date: 5/1/03

By: ______________________ (SEAL)
Timothy C. Cox
Chief Operating Officer

## LIST OF EXHIBITS


| | | |
|---|---|---|
| Exhibit A | - | Legal Description |
| Exhibit B | - | Phasing Plan |
| Exhibit C | - | Additional Purchase Price Schedule |
| Exhibit D | - | Title Commitment |

# EXHIBIT A

DESCRIPTION OF PARCEL 121/19

Being all of Parcel 121/19, Square 3663, as designated by the Office of the Surveyor of the District of Columbia, and being more particularly described as follows;

Beginning at a point on the easterly right of way line of North Capitol Street (160 feet wide), said point being on the southerly line of Parcel 122/53, Square 3663, 30.05 feet from the southwest corner thereof, and also being the northwest corner of Parcel 121/19 as described herein; thence leaving said point and running with the southerly lines of aforesaid Parcel 122/53 and of Parcel 122/55,

1. North 79° 17' 10" East, 1044.66 feet to the southeast corner of said Parcel 122/55, said point also being on the westerly right of way line of Harewood Road, N.E.; thence running with said right of way line,

2. South 08° 28' 40" East, 1926.18 feet to the intersection with the northerly line of Parcel 121/20; thence running with said northerly line,

3. South 81° 56' 16" West, 847.30 feet to intersect the northerly right of way line of Irving Street; thence running with said right of way line of Irving Street,

4. 252.60 feet along the arc of a curve deflecting to the right and having a radius of 180.00 feet and a chord bearing and distance of North 57° 51' 33" West 232.38 feet to the intersection with the easterly right of way line of North Capitol Street; thence running with said right of way line of North Capitol Street,

5. 131.88 feet along the arc of a curve deflecting to the left and having a radius of 240.00 feet and a chord bearing and distance of North 33° 23' 52" West 130.22 feet; thence,

6. North 49° 08' 22" West, 42.51 feet; thence,

7. 345.58 feet along the arc of a curve deflecting to the right and having a radius of 340.93 feet and a chord bearing and distance of North 20° 06' 04" West 330.97 feet; thence,

8. 119.25 feet along the arc of a curve deflecting to the left and having a radius of 3080.00 feet and a chord bearing and distance of North 07° 49' 40" East 119.24 feet; thence,

9. 1149.32 feet along the arc of a curve deflecting to the left and having a radius of 3166.22 feet and a chord bearing and distance of North 03° 40' 49" West 1143.02 feet to the point of beginning; containing 46.96 acres of land, more or less.

# EXHIBIT B

## United States Armed Forces Retirement Home

**Washington, D.C.**

Stout and Teague / Pulte



Approx. 17.5 acres PHASE 1



Approx. 12 acres PHASE 2



Approx. 10 acres PHASE 3



Approx. 9.5 acres PHASE 4

Phasing Plan (Total: approx 49 acres)

# EXHIBIT C

**Armed Forces Retirement Home – Washington**
**49 Acres**
**Additional Purchase Price Schedule**

| Phase | Base Units | Maximum Price Increase for Units over Base (10,000/unit) |
|---|---|---|
| 1 | 402 | $1,368,740 |
| 2 | 101 | $ 343,887 |
| 3 | 432 | $1,470,885 |
| 4 | 184 | $ 626,488 |
| Total | | $3,810,000 |

Any subsidized/affordable housing units will be excluded from above figures and obligation for price increase.

**Exhibit D**
**Armed Forces Retirement Home**
**49 Acres – Washington, DC**
**Title Commitment**

COMMITMENT FOR
TITLE INSURANCE

AMERICAN LAND TITLE ASSOCIATION
1966

ISSUED BY
COMMONWEALTH LAND TITLE INSURANCE COMPANY

Commonwealth
A LANDAMERICA COMPANY

Title Insurance Since 1876

HOME OFFICE
101 Gateway Centre Parkway, Gateway One
Richmond, Virginia 23235-5153
1-800-446-7086

B 1004-8

ISSUED BY
COMMONWEALTH LAND TITLE INSURANCE COMPANY

**Commonwealth**
A LANDAMERICA COMPANY

COMMITMENT FOR TITLE INSURANCE

Commonwealth Land Title Insurance Company, a Pennsylvania corporation, herein called the Company, for a valuable consideration, hereby commits to issue its policy or policies of title insurance, as identified in Schedule A, in favor of the proposed Insured named in Schedule A, as owner or mortgagee of the estate or interest covered hereby in the land described or referred to in Schedule A, upon payment of the premiums and charges therefor; all subject to the provisions of Schedules A and B and to the Conditions and Stipulations hereof.

This Commitment shall be effective only when the identity of the proposed Insured and the amount of the policy or policies committed for have been inserted in Schedule A hereof by the Company, either at the time of the issuance of this Commitment or by subsequent endorsement.

This Commitment is preliminary to the issuance of such policy or policies of title insurance and all liability and obligations hereunder shall cease and terminate 120 days after the effective date hereof or when the policy or policies committed for shall be issued, whichever first occurs, provided that the failure to issue such policy or policies is not the fault of the company.

IN WITNESS WHEREOF, COMMONWEALTH LAND TITLE INSURANCE COMPANY has caused its corporate name and seal to be hereunto affixed by its duly authorized officers, the Commitment to become valid when countersigned by an authorized officer or agent of the Company.

COMMONWEALTH LAND TITLE INSURANCE COMPANY

Attest: Wm. Chadwick Perrine, Secretary

By: Janet A. Alpert, President

## Conditions and Stipulations

1. The term mortgage, when used herein, shall include deed of trust, trust deed, or other security instrument.

2. If the proposed Insured has or acquires actual knowledge of any defect, lien, encumbrance, adverse claim or other matter affecting the estate or interest or mortgage thereon covered by this Commitment other than those shown in Schedule B hereof, and shall fail to disclose such knowledge to the Company in writing, the Company shall be relieved from liability for any loss or damage resulting from any act of reliance hereon to the extent the Company is prejudiced by failure to so disclose such knowledge. If the proposed Insured shall disclose such knowledge to the Company, or if the Company otherwise acquires actual knowledge of any such defect, lien, encumbrance, adverse claim or other matter, the Company at its option may amend Schedule B of this Commitment accordingly, but such amendment shall not relieve the Company from liability previously incurred pursuant to paragraph 3 of these Conditions and Stipulations.

3. Liability of the Company under this Commitment shall be only to the named proposed Insured and such parties included under the definition of Insured in the form of policy or policies committed for and only for actual loss incurred in reliance hereon in undertaking in good faith (a) to comply with the requirements hereof, or (b) to eliminate exceptions shown in Schedule B, or (c) to acquire or create the estate or interest or mortgage thereon covered by this Commitment. In no event shall such liability exceed the amount stated in Schedule A for the policy or policies committed for and such liability is subject to the insuring provisions, the Conditions and Stipulations, and the Exclusions from Coverage of the form of policy or policies committed for in favor of the proposed Insured which are hereby incorporated by reference and are made a part of this Commitment except as expressly modified herein.

4. Any action or actions or rights of action that the proposed Insured may have or may bring against the Company arising out of the status of the title to the estate or interest or the status of the mortgage thereon covered by this Commitment must be based on and are subject to the provisions of this Commitment.

PA 3
ALTA Commitment – 1966
Cover Page
Form 1004-8

ORIGINAL

**COMMONWEALTH LAND TITLE INSURANCE COMPANY**
**COMMITMENT FOR TITLE INSURANCE**
**SCHEDULE "A"**

| | |
|---|---|
| **CSI Commitment No.** **02-0877 (Rev 1)** | **Effective Date of Commitment:** **December 12, 2002 at 7:30 A.M.** |
| **Project Name:** **Soldiers Home** | **Prepared For:** **Haight, Tramonte, Siciliano, Flask, Yeonas** |

**Inquiries Should Be Directed To:**

**Commercial Settlements, Inc.**
**1015 15th Street, N.W., Suite 300**
**Washington, D.C. 20005**
**Attn: Dennis J. Vendetti**
**(202) 312-5112**
**(202) 737-4108 (FAX)**

1. Policy or Policies to be issued:

(A) ☑ ALTA Owner Policy: 1992 Amount: $ TBD

Proposed INSURED: **Patriot LLC**

(B) ☑ ALTA Loan Policy: 1992 Amount: $ TBD

Proposed INSURED: TBD

2. The estate or interest in the land described or referred to in the Commitment and covered herein is **Fee Simple**.

3. Title to said estate or interest in said land is at the effective date hereof vested in:

**The United States of America**

4. The land referred to in this Commitment is situated in the District of Columbia and is described as follows:

See Exhibit A for legal description

Countersigned: ______________________________
Authorized Officer
Valid Only If Schedule B and Cover Are Attached

COMMONWEALTH LAND TITLE INSURANCE COMPANY
COMMITMENT FOR TITLE INSURANCE

| | |
|---|---|
| **CSI Commitment No.** | **02-0877** |

**Schedule B - Part I**

The following are the requirements to be complied with:

A. Pay the agreed amounts for the interest(s) to be insured.

B. Pay us the premiums, fees and charges for the policy.

C. Instruments satisfactory to create the estate or interest to be insured must be properly executed, delivered and duly filed for record.

Note: A properly completed, executed and acknowledged Real Property Recordation Tax and Transfer Tax Form FP 7/C (the "FP 7/C") must accompany each deed and deed of trust submitted for recordation.

Note: The Office of the Recorder of Deeds may assess the following charges in connection with transfers submitted for recordation:

(1) Transfer Tax calculated at the rate of 1.5% of consideration; and
(2) Recordation Tax calculated at the rate of 1.5% of consideration.

D. The Company must be advised in writing of the name of any party not referred to in this Commitment who will acquire an interest in the land, or who will either obtain or make a loan or mortgage encumbering the land. The Company may then make additional requirements, or take additional exceptions to coverage on Schedule B, Part II.

E. The following must also be complied with:

1. All real property taxes and assessments, general and special, must be paid through March 31, 2003.

Note: Taxes are assessed on a fiscal year from October 1st through September 30th, and are paid in two (2) equal installments. The 1st installment is due on or before March 31st for the period from October 1st through March 31st; the 2nd installment is due on or before September 15th for the period from April 1st through September 30th.)

Note: The property is currently identified as "Non-Taxable"

**COMMONWEALTH LAND TITLE INSURANCE COMPANY**
**COMMITMENT FOR TITLE INSURANCE**

| CSI Commitment No. | 02-0877 |
|---|---|

2. Evidence must be submitted of both the determination and payment of all other taxes, assessments, bonds and charges now due, and which may become due prior to the effective date of the policy anticipated by this Commitment. These taxes, assessments, bonds and charges include, but are not limited to:
   a. liens held by the Breen Capital Services Corporation (the "Breen List");
   b. outstanding liens in favor of the Office of Space Adjudication;
   c. liens for work performed by the Department of Public Works ("Clean & Lien" charges);
   d. water charges, and sanitary sewer service charges through and including the effective date of said policy.

3. A plat or survey must be submitted which has been made in accordance with "Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys" adopted in 1999, and in addition, at least Table A items 1, 2, 8, 10, 11(b), 14, and 15. Matters disclosed by the survey which in the Company's judgment constitute defects in title to the property will be shown as exceptions to coverage under the proposed policy, replacing elements of the general exceptions currently shown on this Commitment in Schedule B, Part II, Paragraph #2.

4. A complete and accurate metes and bounds description of the Property must be furnished which is consistent with the land depicted on the Survey referred to above. The Company reserves the right to substitute this description for the description of the Property currently shown on Schedule A, Paragraph #4 (Exhibit "A").

5. Evidence must be submitted which is sufficient, in the Company's judgment, to establish:
   a. compliance with Public Law 106-65, Section 384, whereby the Congress of the United States directed the land be developed on a for-profit basis to offset the operating costs of an Assisted Living Facility operated on the premises for Non-Commissioned Officers;
   b. compliance with Public Law 104-201, Section 1053, whereby the Armed Forces Retirement Home Board ("AFRHB") is authorized to convey the Property upon certain terms and conditions.

COMMONWEALTH LAND TITLE INSURANCE COMPANY
COMMITMENT FOR TITLE INSURANCE

| CSI Commitment No. | 02-0877 |
|---|---|

6. All current owners of the property must execute and deliver to the Company affidavits which in the Company's judgment are sufficient in both form and content to identify:
   a. rights or claims of parties in possession not shown by the public records;
   b. easements, or claims of easements, not shown by the public records; or
   c. the occurrence of any event which could give rise to any lien, or right to a lien, for services, labor, or material furnished, imposed by law and not shown by the public records.

   Matters disclosed by the affidavits which in the Company's judgment constitute defects in title to the property will be shown as exceptions to coverage under the proposed policy, replacing the general exceptions currently shown on this Commitment in Schedule B, Part II, Paragraphs #2(a), (b), and (c).

7. **Item Nos. 5 and 6 of Schedule B, Section II of this commitment will not appear in the final policy(ies) provided any and all claims, objections to the sale contemplated by this commitment, and/or other rights as may be claimed or asserted by Catholic University, including those raised in Case No. 02-1896C in the United States Court of Federal Claims, are released and terminated with regard to the land described in Schedule A herein. Such release and termination must include either a final dismissal of the aforesaid Federal Claims case or the entry of a final, non-appealable order in the aforesaid action that constitutes a determination that Catholic University has no right to object to the sale of the land to the Proposed Insured or has any other claims with regard to the land.**

8. Evidence of the satisfaction of the matters referred to above must be received by the Company at least 48 hours in advance of settlement.

   Final letters of instruction on behalf of each of the parties to the transaction must be received by the Company at least 24 hours in advance of settlement.

   Scheduled settlements may be delayed if these requirements are not met.

**(End of Schedule B-Part I)**

**COMMONWEALTH LAND TITLE INSURANCE COMPANY**
**COMMITMENT FOR TITLE INSURANCE**

| CSI Commitment No. | 02-0877 |
| --- | --- |

**Schedule B – Section II**

Schedule B of the policy or policies to be issued will contain exceptions to the following matters unless the same are disposed of to the satisfaction of the Company:

1. Defects, liens, encumbrances, adverse claims or other matters, if any, created, first appearing in the public records or attaching subsequent to the effective date hereof but prior to the date the proposed Insured acquires for value of record the estate or interest or mortgage thereon covered by this Commitment.

2. Standard Exceptions:
   a. Rights or claims of parties in possession not shown by the public records.
   b. Easements, or claims of easements, not shown by the public records.
   c. Any lien, or right to a lien, for services, labor, or material heretofore or hereafter furnished, imposed by law and not shown by the public records.
   d. Encroachments, overlaps, boundary line disputes, or other matters which would be disclosed by an accurate survey or inspection of the premises.

3. Real Estate Taxes subsequent to September 30, 2002, a lien not yet due and payable.

4. Taxes or special assessments which are not shown as existing liens by the public records, or which are not due and payable as of the date of the policy anticipated by this Commitment.

5. Conditions and restrictions set forth in Deed from William W. Corcoran to the United States of America dated December 7, 1872 and recorded March 25, 1873 in Liber 711 at Folio 112.

6. Conditions and restrictions set forth in Deed from Elizabeth Wood, et al to the United States of America, dated October 25, 1876 and recorded November 16, 1876 in Liber 839 at Folio 2.

7. The effect of the fact that parts of the property are the subject of plats entitled "Transfer of Jurisdiction" recorded in the Office of the Surveyor for the District of Columbia in Liber 129 at Folio 4; in Liber 133 at Folio 10; and in Liber 138 at Folio 196 with respect to North Capitol and Irving Streets, NE.

**(End of Schedule B - Section II)**

**EXHIBIT "A"**
**(Legal Description)**

ALL that certain lot or parcel of land together with all improvements thereon located and being in the City of Washington in the District of Columbia and being more particularly described as follows:

Part of Parcel 121/19 containing 49.096 acres of land, more or less.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| THE CATHOLIC UNIVERSITY OF AMERICA,<br>Plaintiff,<br>v.<br>THE UNITED STATES OF AMERICA,<br>Defendant,<br>and<br>STOUT &TEAGUE/PULTE HOMES, INC.<br>Defendant-Intervenor | No. 02-1896C<br>Judge Wiese |

**SUBMISSION OF FIRST AMENDMENT TO AGREEMENT OF LEASE WITH OPTION TO PURCHASE**

During the court proceedings on Wednesday, September 24, 2003, counsel for Defendant-Intervenor, Stout & Teague/Pulte Homes, Inc., committed to Intervenor's willingness and ability to reinstate its original offer of $26 million, subject to zoning, for the property at issue in this case. Attached for the Court's information is a copy of Intervenor's First Amendment to Agreement of Lease With Option to Purchase ("Agreement"). This amendment, provided to the Defendant by overnight courier, substitutes Intervenor's original $26 million cash offer in place of the current, phased payment, offer totaling $32.7 million currently in the Agreement.

Respectfully submitted,

October 16, 2003

D. E. Wilson, Jr.
SHOOK, HARDY & BACON, L.L.P.
600 14th Street, N.W., Suite 800
Washington, D.C. 20005-2004
(202) 783-8400

*Counsel for Defendant-Intervenor, Stout & Teague/Pulte Homes, Inc.*

Tamara Y. Brown
Of Counsel
SHOOK, HARDY & BACON, LLP
600 14th Street, N.W., Suite 800
Washington, D.C. 20005-2004
(202) 783-8400

**PATRIOT LLC**

BY OVERNIGHT DELIVERY

October 16, 2003

Mr. Timothy C. Cox
Chief Operating Officer
Armed Forces Retirement Home
3700 North Capitol Street, NW
Washington, DC 20317-0002

Dear Mr. Cox:

This letter transmits a proposed amendment to the Purchase Agreement between Patriot LLC and the Armed Forces Retirement Home. The amendment has been executed by Stout and Teague Company and Pulte Homes on behalf of Patriot LLC, and we are prepared to proceed under its terms.

Very truly yours,

G. Neel Teague,
Vice President
Stout and Teague Company, Member,
Patriot LLC

1340 OLD CHAIN BRIDGE ROAD, SUITE 400, MCLEAN, VA 22101. TEL: (703) 245-9950. FAX: (703) 245-9955

## FIRST AMENDMENT TO
## AGREEMENT OF LEASE WITH OPTION TO PURCHASE

THIS FIRST AMENDMENT TO AGREEMENT OF LEASE WITH OPTION TO PURCHASE (this **"Amendment"**) is made and entered into effective on the last date entered beside the signatures at the end of this Agreement by and between the Armed Forces Retirement Home, an agency of the United States of America (**"AFRH"**) and Patriot LLC, a District of Columbia limited liability company (**"Developer"**).

RECITALS:

A. AFRH and Developer entered into that certain Agreement of Lease with Option to Purchase effective May 1, 2003 (the **"Agreement"**) for the lease or purchase of real property located in the District of Columbia and more particularly described in the Agreement.

B. AFRH and Developer by this Amendment intend to modify certain provisions of the Agreement in order to establish a single date for settlement on the entire Property and to adjust the Purchase Price accordingly.

NOW, THEREFORE, in consideration of the foregoing Recitals, each of which is incorporated into and made a part of this Agreement, the mutual covenants of AFRH and Developer set forth below and in the Agreement, and for other good and valuable consideration, the receipt and sufficiency of which each of the parties hereby acknowledges, AFRH and Developer agree as follows:

1. Any capitalized term used in this Amendment and not defined herein will have the definition provided for it in the Agreement.

2. Section 3.A of the Agreement is deleted in its entirety and the following is substituted for it:

> A. Developer has prior to the Effective Date delivered to AFRH an initial earnest money deposit in the amount of Four Hundred Thousand Dollars ($400,000.00) (the **"Initial Deposit"**). From the Effective Date of this Agreement until the date of final and absolute extinguishment (**"Final Extinguishment"**) of the right of first refusal to the Property held by Catholic University of America (**"CUA"**) (CUA's right of first refusal being herein the **"Right of First Refusal"**), the Initial Deposit shall be reduced to One Hundred Thousand Dollars ($100,000.00), and within fifteen (15) business days after the Effective Date, AFRH shall refund to Developer Three Hundred Thousand Dollars ($300,000.00) of the Initial Deposit.. Within fifteen (15) business days after the Final Extinguishment of the Right of First Refusal, Developer (i) shall restore the Initial

Deposit to Four Hundred Thousand Dollars ($400,000.00) cash by delivery of Three Hundred Thousand Dollars ($300,000.00) (the "**Restoration Deposit**") to AFRH, and (ii) shall deliver to AFRH an additional earnest money deposit in the amount of Four Hundred Thousand Dollars ($400,000.00) (the "**Second Deposit**") which may, at Developer's option, be in the form of a letter of credit. If a letter of credit is used as the Second Deposit, such letter of credit will be termed herein the "**Letter of Credit**" and will be issued by a federally chartered financial institution selected by Developer and reasonably acceptable to AFRH. The Letter of Credit will be in a form reasonably acceptable to AFRH. "**Deposit**" as used herein will mean and refer to the amount held by AFRH or otherwise posted by Developer from time-to-time in accordance with the provisions of this Agreement.

3. Section 3.D of the Agreement is hereby modified to substitute the word "Settlement" for the phrase "Final Settlement".

4. Section 4 of the Agreement is hereby deleted in its entirety and the following is substituted for it:

4. OPTION TO PURCHASE; PURCHASE PRICE AND METHOD OF PAYMENT.

A. Developer shall have a one-time option to elect to acquire fee simple to the entire Property upon, and subject to, the terms of this Agreement. Such option will be exercisable by Developer at any time by Developer's delivery to AFRH of written notice ("**Developer's Election Notice**") stating that Developer has elected to purchase, rather than lease, the Property. Once made, such election shall be final and irrevocable and the provisions of this Agreement pertaining to lease of the Property shall automatically terminate and be of no force and effect as of the date of Developer's delivery of Developer's Election Notice. Subject to adjustments as set forth in Section 4.C. and 4.D., the Purchase Price for the Property under such option (the "**Purchase Price**") shall be Twenty-six Million Dollars ($26,000,00.00).

B. The Purchase Price shall be payable by electronic funds transfer or certified funds at Settlement.

C. In the event that Settlement has not occurred on or before the date that is the earlier of (a) thirty (30) months after the Effective Date or (b) twelve (12) months after the date of Final Extinguishment of the Right of First Refusal, and neither party is in default hereunder, then beginning on the date that is the earlier of (a) thirty (30) months after the Effective Date or (b) twelve (12) months after the date of Final Extinguishment of the Right of First Refusal, (the "**Escalator Start Date**"), the Purchase Price, shall increase until the day of Settlement at the annual simple rate that is the lesser of (i) six percent (6%) or (ii) 150% of the percentage increase (if any) of the Consumer Price Index Component for

Housing (published every month by the United States Department of Labor, Bureau of Labor Statistics) from the Effective Date to the Escalator Start Date provided, however, in no event shall such increase, if determined pursuant to clause (ii) of this sentence, be at an annual rate that is less than two percent (2%). In either event, the amount of the Purchase Price increase described in this Section 4.C shall be determined for the actual number of days between the Escalator Start Date and Settlement based on a 365-day year.

D. The Purchase Price shall be increased by the Rezoning Fee (or so much thereof as has been paid by AFRH to Developer and not reimbursed to AFRH prior to the date of Settlement) and all Rezoning Filing Fees not reimbursed by Developer prior to the date of Settlement in accordance with Section 11 below. The Rezoning Fee (or so much thereof as has not been reimbursed to AFRH) and all such Rezoning Filing Fees (not reimbursed to AFRH) shall be added to the Purchase Price to be paid at Settlement.

5. Section 5 of the Agreement is deleted in its entirety and the following is substituted for it:

5. SETTLEMENT.

A. Subject to the full satisfaction of each and all of the Conditions Precedent in accordance with Section 6 hereof, settlement on the Property (**"Settlement"**) shall occur within sixty (60) days after the Final Rezoning (as defined in Section 6 below) of the Property.

B. Developer shall provide AFRH thirty (30) days advance written notice of the anticipated date of Settlement.

C. Settlement shall be held at the offices of Commercial Settlements, Inc., 1413 K Street, NW, Washington, D.C. 20005 or such other location in the District of Columbia as is reasonably acceptable to both parties.

D. The deed from Seller to Developer ("Seller's Deed") will be exempt from transfer tax and fees in accordance with Sections 47-902 of the District of Columbia Code. All Settlement-related costs and expenses pertaining to examination of title, title insurance, title certificate, recording costs, transfer taxes, revenue and documentary stamps, survey preparation and Developer's attorneys fees shall be at the expense of Developer; provided, however, Developer shall have no obligation to pay the District of Columbia transfer tax on Seller's Deed. AFRH's attorney's fees shall be at the cost and expense of the AFRH.

F. Real estate taxes, if any, for the Property at a Settlement are to be adjusted to the date of Settlement and thereafter paid by Developer.

G. At Settlement, AFRH shall execute and deliver to Developer a Special Warranty Deed for the Property conveying title in accordance with Paragraph 6 hereof and shall execute such affidavits as are reasonably required by the Developer's title insurance company.

H. AFRH shall deliver to Developer at Settlement possession of the Property free of tenants and human occupants.

J. In the event that either the Lease Commencement Date or Settlement has not occurred on or before the date that is five (5) years after the Effective Date because there has been no Final Extinguishment of the Right of First Refusal or due to failure of satisfaction of any of the Conditions Precedent set forth in Section 6 below, and neither party is in default hereunder, then at any time after such 5-year period either party may terminate this Agreement upon 120-day prior written notice to the other party (a "**Termination Notice**"); provided, however that no such termination shall be effective unless and until (i) the Deposit is returned to Developer, and (ii) in the event that there has been no Final Extinguishment of the Right of First Refusal, the payment by AFRH to Developer of a Break-up Fee of Two Hundred Seventy-five Thousand Dollars ($275,000) (the "**Break-up Fee**").

6. Sections 6.A, 7.B, 8.A, and 8.B of the Agreement are hereby modified, as applicable, (i) to substitute the word "Settlement" for the phrase "each Settlement" and/or the phrase "a Settlement" wherever such phrase/s appears, and (ii) to substitute the word "Property" for the phrase "Phase subject to the Settlement" and/or the phrase "the portion of the Property being conveyed at such Settlement" wherever such phrase/s appear.

7. Section 6.B (ii) and Section 6.B (iii) of the Agreement are hereby deleted in their entirety.

8. Section 9.A of the Agreement is hereby modified by the deletion of the phrase "on its acquisition of a Phase".

9. Sections 11.A, 11.B and 11.C of the Agreement are hereby deleted in their entirety and the following are substituted for Sections 11.A and 11.B respectively (it being the intent of the parties that there be no substitution for Section 11.C):

A. Developer, shall begin the zoning process for the Property promptly after the Effective Date, and shall thereafter diligently pursue Final Rezoning of the Property in accordance with the provisions of this Agreement and the Phasing Plan (a copy of which is attached hereto as Exhibit B), as the Phasing Plan may be altered or amended from time to time. Developer's scheduling community planning meetings and/or other pre-application meetings shall be deemed commencement of the zoning process. Developer

intends to seek approved densities for development of the Property as described in the Offer and on the Phasing Plan, and intends to seek such densities initially in a zoning of the entire Property into one or more zoning districts. With the prior written approval of AFRH, which will not be unreasonably withheld, Developer may pursue additional densities, design changes and/or change of use by making application for applicable rezoning or special exception on a phase-by-phase basis. AFRH hereby authorizes Developer to prepare and file in the name of Developer and thereafter diligently pursue approval of, all applications for zoning, rezoning, permits and entitlements as necessary to obtain a Final Rezoning that has been approved by AFRH. If such applications in the sole name of Developer are not acceptable to the applicable governmental or quasi-governmental authorities, then AFRH shall execute all such applications that have been approved by AFRH promptly in order to permit Developer to timely file such applications. AFRH hereby designates Timothy C. Cox and any subsequent Chief Operating Officer of AFRH, as the duly authorized agent of AFRH to execute such applications, and AFRH agrees to designate additional agents of AFRH to execute such applications if requested by Developer in order to assist Developer in the timely execution and filing of such applications. As used herein, "applications" shall mean all applications and all amendments and other documents and instruments related thereto including without limitation plats, plans, proffers/entitlements, affidavits and similar documents required by appropriate governmental authorities. To the extent the same are assignable by AFRH without consent by any third parties or governmental authorities, or if such consent is required, upon obtaining such consent, all existing permits, licenses, approvals, rights, assurances and/or entitlements from applicable governmental and quasi-governmental authorities and all environmental approvals, if any, pertaining to the Property shall be transferred to the Developer at Settlement. Developer agrees to confer with a designated representative of AFRH regularly (i.e., at least once a month) with regard to the rezoning effort, and upon AFRH's advance written request, Developer shall provide AFRH reasonable advance notice of all meetings with District of Columbia zoning staff and other third parties (except for meetings only between Developer and its third party contractors) pertaining to the rezoning and invite AFRH's representatives to attend all such meetings. Developer shall provide AFRH with contemporaneous written or oral periodic progress reports on all significant developments at approximately once every thirty (30) days on its efforts to obtain rezoning approval and Developer shall provide to AFRH copies of all materials and plans as submitted to the applicable authorities of the District of Columbia.

B. AFRH agrees to cooperate with Developer's efforts in seeking a rezoning of the Property; provided that Developer shall pay for the preparation of all rezoning materials (subject to reimbursement by AFRH as provided in Section 11D below). AFRH agrees to cooperate reasonably with Developer (at Developer's cost including the reasonable cost of AFRH's counsel) in Developer's efforts to obtain any off-site easements that may be necessary for development of the Property. AFRH shall not be required to pay for any costs in connection with preparation or use of such documents. Developer shall pay for the preparation of all such documents. Prior to Settlement, no documents shall be recorded in the land records to convey easements across or otherwise

encumber the Property without AFRH's express consent, which may be withheld in AFRH's sole discretion.

10. AFRH and Developer each hereby certifies that (a) neither party is in default under the terms of the Agreement, (ii) to its knowledge, no event has occurred which with notice or the passage of time or both would create a default under the Agreement, (ii) neither party has issued or received a notice of default under the Agreement.

11. AFRH and Developer confirm and reaffirm the Agreement as modified herein. This Amendment may be executed in counterparts, which, when taken together, shall constitute one original.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed as of the Effective Date.

DEVELOPER:

PATRIOT, LLC, a District of Columbia limited liability company

By: Pulte Home Corporation, Member

Date: 10/14/2003

By: [signature] (SEAL)
Its: Attorney In Fact

By: Stout and Teague ~~Company, Member~~

Date: 10/13/03

By: [signature] (SEAL)
Its: Vice President

AFRH:

ARMED FORCES RETIREMENT HOME, an agency of the United States of America

Date:__________

By:____________________(SEAL)
Timothy C. Cox
Chief Operating Officer

# CERTIFICATE OF SERVICE

I hereby certify that the attached Submission Of First Amendment To Agreement Of Lease With Option To Purchase, was served by hand delivery and first-class U.S. mail, postage prepaid on the 16th day of October, 2003, on:

Thomas P. Humphrey, Esquire
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
202-628-5116 (fax)
*Counsel for The Catholic University of America, Plaintiff*

and

William K. Olivier, Esquire
Civil Division
Department of Justice
1100 L Street, N.W.
Attention Classification Unit 8th Floor
Washington, D.C. 20530
202-514-7965 (fax)
*Counsel for the United States of America, Defendant*

D. E. Wilson, Jr.